# In the United States Court of Federal Claims

No. 25-1004
Filed: December 4, 2025[*]
FOR PUBLICATION

---

**AERY AVIATION, LLC,**

        *Plaintiff,*

**v.**

**UNITED STATES,**

        *Defendant,*

**v.**

**PHOENIX AIR GROUP, INC.,**

        *Defendant-Intervenor.*

---

*Benjamin Randall Little*, Dentons Sirote PC, Florence, AL, for the plaintiff.

*Matthew Jude Carhart*, Civil Division, U.S. Department of Justice, Washington, DC, with *Morgan E. Gierhart*, U.S. Department of the Navy, of counsel, for the defendant.

*Barbara Susan Kinosky*, Centre Law and Consulting LLC, Tysons, VA, with *Brandon Graves*, of counsel, for the defendant intervenor.[1]

## MEMORANDUM OPINION

**HERTLING, Judge**

In this post-award bid protest, Aery Aviation, LLC ("Aery") challenges the award by the defendant, acting through the United States Navy ("Navy"), to Phoenix Air Group, Inc. ("Phoenix") of solicitation N0042124R003 (the "solicitation") for Contracted Air Services ("CAS") Electronic Warfare ("EW") services. The CAS EW contract is a follow-on requirement to continue work awarded to, and currently being performed by, Strategic Airborne Operations

---

[*] Pursuant to the protective order in this case, this opinion was under seal on November 21, 2025, and the parties were directed to propose by December 3, 2025, any redactions of confidential or proprietary information. The parties did not propose any redactions. Accordingly, the opinion is released in full.

[1] On June 24, 2025, Phoenix Air Group, Inc., moved to intervene. (ECF 17.) On June 25, 2025, Phoenix's motion was granted. Phoenix filed no motion and submitted no briefs.

JV, LLC ("SAO") under solicitation N0042120D0108 (the "predecessor contract"). (AR 340.) When the predecessor contract was awarded, SAO was a joint venture between Aery and Mountain Aviation, Inc. ("Mountain"). (AR 47350-51.) Shortly after the award of the predecessor contract, Mountain was acquired by a third party and stopped performing on the predecessor contract. (*Id.;* AR 46979.)

In this protest, Aery alleges that the Navy performed flawed technical and past-performance evaluations of Aery's proposal and reached an erroneous source-selection decision. As a result, Aery alleges it was improperly deemed ineligible for award. Aery argues that: (1) the Navy's assignment of a deficiency for failing to demonstrate that six of its aircraft were approved to carry the ALQ-164, an underwing pod, lacked a rational basis and is contrary to the evidence before the Navy; (2) the Navy disparately treated Aery by assigning it, but not Phoenix, a deficiency on this issue, even though Phoenix had also proposed aircraft that were not approved to carry the ALQ-164 pod; (3) the Navy failed to consider important aspects of Aery's past performance, especially Aery's ability to continue to perform the work on the predecessor contract after losing a member of the joint venture; and (4) the Navy failed to follow the evaluation criteria by not considering Aery's most recent performance under the predecessor contract. Aery also seeks to supplement the administrative record to include a February 2025 Program Management Review ("PMR") that it argues offers information about the plaintiff's recent successful performance on the predecessor contract.

The Navy did not improperly evaluate either Aery's technical proposal or past performance. It was proper for the Navy to issue Aery a deficiency for failing to demonstrate in its proposal that it could modify supplemental type certificates ("STCs") to bring its proposed aircraft into compliance by allowing them to carry the ALQ-164 pod. Moreover, Aery's disparate treatment argument ignores that Phoenix's proposal to purchase and modify the necessary STCs to allow its planes to carry the ALQ-164 pod is distinguishable from Aery's proposal. Aery is thus unable to show that the Navy treated its proposal disparately from Phoenix's. As for past performance, the Navy's evaluation makes clear that the Navy was aware of and adequately considered that Aery was the only entity to perform under the joint venture. Aery misstates the substance of the Navy's evaluation, which properly acknowledges Aery's improved performance. The Navy's evaluation also considered relevant and recent data provided by Aery.

Accordingly, the plaintiff's motion for judgment on the administrative record is denied, and the defendant's cross-motion for judgment on the administrative record is granted. Additionally, the existing administrative record provides enough information for the evaluation of the Navy's past performance assessment without relying on extra-record evidence. The plaintiff's motion to supplement the administrative record is denied.

## I.    FACTUAL BACKGROUND

### A.    Preliminary Events

Between January and February 2023, the EW Integrated Product Team conducted market research into the procurement of "Contractor Owned Contractor Operated (COCO) . . . EW Jet

services" on behalf of naval air forces.  (AR 133-37; AR 630.)  The EW jet-services contract was intended to continue the work being performed by SAO under the predecessor contract.  (AR 340.)

The predecessor contract with an ordering period from May 14, 2020, until May 12, 2025, was awarded to SAO, a joint venture between Aery and Mountain.  (AR 136; AR 47350.)  Under the joint venture, Mountain was the lead member, providing "flight operations, training requirements, regulatory compliance, [and] pilot and other specialized staff recruiting. . . ." (*Id*.)  Aery was to "conduct maintenance activities, parts and logistics supply, modification and engineering and other administrative tasks." (*Id*.)  Shortly after the Navy awarded the predecessor contract to SAO, Mountain was acquired by a third party.  The third-party acquirer of Mountain Aviation refused to perform under the joint venture.  (*Id*.)  Unwilling to be terminated for default, Aery assumed Mountain's responsibilities, but it lacked sufficient resources, experience, and capital.  (AR 47351.)  Aery is continuing to perform the predecessor contract under a bridge contract with a base period of 12 months and an ordering period running through May 12, 2027.  (ECF 33 at 32.)

On January 23, 2023, the Navy posted a request for sources sought on SAM.gov.  (AR 49.)  Aery and Phoenix provided the only responses.  (AR 38.)  Based on its market research, the Navy determined that it would conduct a full and open competition under FAR Part 15 for an EW jet-services contract.  (AR 137; AR 345; AR 20254.)

### 1.  Request for Proposals

On October 10, 2023, the Navy issued the solicitation as a request for proposals ("RFP") for CAS EW services as a single-award, Indefinite-Delivery/Indefinite-Quantity contract with a four-year and 364-day ordering period.  (AR 552-53.)  The solicitation was amended twice "for administrative changes and due date extensions."  (AR 46943.)

The solicitation seeks COCO EW Jet Services and requires the awardee to provide Federal Aviation Administration ("FAA")-certified aircraft and personnel capable of "simulat[ing] a wide variety of airborne threats to train and test/evaluate shipboard and aircraft squadron weapon systems operators and aircrew on how to conduct Fleet air defense and counter potential enemy EW and Electronic Attack (EA) operations."  (AR 630.)  These services are to be provided "in a variety of venues, from basic 'schoolhouse' Air Intercept Control (AIC) training to large multinational exercises or small, single unit training exercises."  (*Id*.)  The services are to be provided in "multiple Continental United States (CONUS) sites and foreign or remote operating bases Outside Continental United States (OCONUS)."  (*Id*.)

The awardee must "ensure all aircraft are equipped with the communication and navigation capability necessary to operate in the U.S. National, international, or foreign nation airspace" and must "comply with other FAA, [International Civil Aviation Organization] or foreign nation equipment pre-requisites and shall be solely responsible for providing such equipment."  (AR 631.)

3

Under the solicitation, the CAS EW services contract is to be awarded based on a best-value determination that considers five evaluation factors: (1) corporate experience; (2) past performance; (3) technical; (4) price; and (5) small business.  (AR 46944.)  Corporate experience and past performance were of equal importance, and corporate experience and past performance were more important than technical.  (AR 3808.)  These first three evaluation factors, separately and combined, were more important than price.  (*Id.*)

The solicitation defines "[b]est value" as:

> the expected outcome of an acquisition that, in the Government's estimation, provides the greatest overall benefit in response to the requirement. The Government advises Offerors that the Government may select to award a contract to a higher-cost/priced Offeror if it determines that the proposal is more beneficial to the Government. However, the perceived benefits of the higher-cost/priced proposal must merit the additional cost/price.

(*Id.*)

### a.      Technical Requirements

The solicitation requires offerors, as a prerequisite, to have available at the time of contract award four aircraft capable of meeting the capability and configuration requirements specificized in Appendix C, Tables 3 and 4 of the Performance-Based Work Statement ("PBWS").  (AR 607.)  This requirement is referred to as an offeror's initial operation capability ("IOC").  (AR 635.)

The remaining aircraft proposed by offerors would have to meet these PBWS requirements within 24 months of contract award.  This requirement is referred to as full operating capability ("FOC").  (*Id.*)  To achieve FOC, an offeror shall have a minimum of "10 [electronic attack] aircraft which include[ ] four (4) aircraft configured for [target-banner tow] missions."  (*Id.*)  These aircraft are required to be compliant with the PBWS-configuration requirements set out in Tables 3 and 4 of Appendix C to the PBWS.  (*Id.*)  For each aircraft proposed, "the Offeror shall either substantiate how the aircraft will meet or exceed the aircraft performance requirements" or "submit a plan detailing the modifications required to bring the aircraft into compliance."  (AR 614.)

Appendix C of the PBWS, entitled "Aircraft Capability and Configuration Requirements," specifies the requirements electronic attack (table 3) and target-banner tow (table 4) aircraft must satisfy.  (AR 660-662.)  The requirements for electronic attack aircraft include having external mounts capable of carrying various items, including the ALQ-164 pod.  (AR 661.)  The ALQ-164 pod is an external "empty pod shell[ ] used to house receive and/or transmit antennas."  (*Id.*)  It is one of several pod mounts listed in the PBWS and required to be flown on an offeror's proposed aircraft.  (*Id.*)

4

### b.    Solicitation Past-Performance Requirements

The solicitation requires that an offeror identify and provide "relevant contract references, or those portions of a relevant contract reference, whose performance is within five (5) years of the solicitation release date and contains efforts that are similar" to those sought in the solicitation.  (AR 610.)  The solicitation notes that Contract Performance Assessment Reporting System evaluations and past performance questionnaires ("PPQs") would be "the primary customer feedback data used to evaluate the Offeror's past performance."  (*Id*.)

## 2.    Initial Contract Award

Aery and Phoenix submitted the only timely proposals on January 4, 2024.  (AR 4185; AR 18555.)  The Source Selection Evaluation Board ("SSEB") began evaluating both proposals that same day.  (AR 46944.)  The SSEB recommended that the award either be made based on the initial proposals or the Navy should establish a competitive range.  (AR 20216.)

As a result of the initial evaluation and Source Selection Advisory Council ("SSAC") discussions, on May 16, 2024, the SSAC sent Aery a "clarification . . .evaluation notice" to allow Aery "to respond to adverse Past Performance it received on a Past Performance Questionnaire [ ] for" a prior contract.  (AR 20245; AR 20436.)  Aery responded to this notice on May 24, 2024.  (AR 20351.)  On June 6, 2024, the SSEB provided Aery's response to the SSAC and the Source Selection Authority ("SSA").  The SSEB also provided the Past Performance Evaluation Team's ("PPET") assessment of Aery's response.  The SSAC then "unanimously concurred with awarding on initial proposals to Phoenix . . . as the best value awardee, all factors considered."  (AR 20436.)  The SSA concurred (*id*.), and on June 28, 2024, the Navy awarded the contract to Phoenix.  (AR 20595.)

### B.    Corrective Action and Evaluations

On July 29, 2024, Aery filed a notice of intent to protest at the Court of Federal Claims, and the Navy issued a stop-work order.  (AR 20643.)  The Navy elected to take corrective action and conduct discussion with both offerors.  (AR 46944.)  On August 12, 2024, the Navy established a competitive range that included both Aery and Phoenix.  As part of establishing a competitive range, the Navy issued additional evaluation notices to both offerors.  Both offerors' responses were received by September 16, 2024.  (AR 45567; AR 45572; AR 45574; AR 46033; AR 46042; AR 46044.)  On December 12, 2024, the Navy sent out requests for final proposal revisions ("FPRs").  (AR 46219; AR 46868.)  Phoenix sent a letter to the Navy stipulating that its initial proposal and responses to the evaluation notices constituted its FPR.  (AR 46873.)  Aery provided its FPR response on December 18, 2024.  (AR 46231-867.)

The proposals were evaluated by the PPET and the Technical Evaluation Team ("TET").  The PPET evaluated the offerors' past performance, using contract references ("CRs") provided by the offerors.  After determining the offerors' relevant CRs, the PPET measured the offerors' past performance against the requirements of the CAS EW services contract and the PBWS.  (AR 460.)  At the same time, the TET evaluated the offerors' technical proposals against each technical elements in the solicitation.  (AR 486.)

After the TET and the PPET completed their evaluations, they provided their evaluations and conclusions to the SSEB. The SSEB then reviewed the evaluations and compiled its own assessments of the offerors' proposals and its recommendation into the SSEB evaluation report. (AR 46939.) The SSEB submitted its report on February 26, 2025. (AR 47053.) The SSEB report provided the following summary of its evaluation:

### IX.  OVERALL SUMMARY

The results of the final evaluation are summarized below:

| Factor | | Aery | PAG |
|---|---|---|---|
| Corporate Experience | | Limited Confidence | Substantial Confidence |
| Past Performance | | Limited Confidence | Substantial Confidence |
| Technical | Rating | Unacceptable | Acceptable |
| | Risk | Unacceptable | Low |
| Toal Proposed Price (TPP) | | $129,791,339.95 | $165,732,375.04 |
| Total Evaluated Price (TEP)* *includes fuel estimate | | $149,156,859.23* | $186,768,601.52* |
| Small Business | | Acceptable | Acceptable |
| Terms and Conditions | | No Issues | No Issues |
| Awardability | | Not Awardable | Awardable |

(AR 47052.)

Aery received limited confidence ratings for corporate experience and past performance, and both its technical and technical-risk ratings were unacceptable. Aery's proposed price, the less important factor, was $37,611,742.30, or approximately 20 percent lower than Phoenix's proposed price. (*Id*.) Because of the limited confidence the Navy had in Aery's corporate experience and past performance, and the unacceptable ratings Aery received for technical and technical-risk factors, the Navy determined that Aery's proposal was unawardable.

The SSEB provided its report to the SSAC and the SSA. The SSAC then provided its recommendation in its proposal-analysis report. (AR 47056.) Thereafter, the SSA made the best-value determination based on the SSEB's and SSAC's recommendations. (AR 531.)

In this protest, Aery challenges the Navy's technical and past performance evaluations of its proposal, so these two sections of the SSEB's report are summarized below.

### 1. Past-Performance Evaluation

In accordance with the solicitation, the PPET evaluated the offerors' demonstrated past performance "in delivering quality products and services similar to the CAS solicitation requirements" in each of the following areas: (1) meeting quality requirements; (2) meeting schedule requirements; (3) managing the contracted effort on similar programs; and (4) small-business subcontracting. (AR 46972.)

6

The Navy's "evaluation was based on information provided with the Offeror's Initial Proposals, [evaluation notice] responses, and FPRs." (AR 46972.) The Navy "considered performance problems not addressed by the Offeror to still exist" and "discount[ed] problems addressed through demonstrated systemic improvement." (*Id*.) The Navy evaluated the offerors' past performance according to the following rating descriptions:

**PAST PERFORMANCE**
**PERFORMANCE CONFIDENCE ASSESSMENT DEFINITIONS**

| Rating | Description |
|---|---|
| Substantial Confidence | Based on the Offeror's recent/relevant performance record, the Government has a high expectation that the Offeror will successfully perform the required effort. |
| Satisfactory Confidence | Based on the Offeror's recent/relevant performance record, the Government has a reasonable expectation that the Offeror will successfully perform the required effort. |
| Neutral Confidence | No recent/relevant performance record is available, or the Offeror's performance record is so sparse that no meaningful confidence assessment rating can be reasonably assigned. The Offeror may not be evaluated favorably or unfavorably on the factor of past performance. |
| Limited Confidence | Based on the Offeror's recent/relevant performance record, the Government has a low expectation that the Offeror will successfully perform the required effort. |
| No Confidence | Based on the Offeror's recent/relevant performance record, the Government has no expectation that the Offeror will be able to successfully perform the required effort. |

(AR 46973.)

### a.     Aery's Past Performance

The predecessor contract was considered both recent and relevant to the PPET's assessment and was used to evaluate Aery's past performance. (AR 46950.) In its evaluation, the PPET "found significant adverse Past Performance on [the predecessor contract], which included a failure to meet capability establishment within the contracted timeline and a failure to provide aircraft and aircrew for simultaneous presentations." (AR 46974.)

After the PPET completed its assessment, the SSEB noted that Aery had "demonstrated adverse Past Performance" on the predecessor contract. (*Id*.) This rating was based on "a failure to meet capability establishment within the contracted timeline and a failure to provide aircraft and aircrew for simultaneous presentations." (*Id*.) As a result, Aery had received a "Marginal" rating in meeting quality requirements during the most recent performance period. (*Id*.)

Upon review of Aery's 2023 Contract Performance Assessment Report ("CPAR") on the predecessor contract, the SSEB noted that "[a]lthough the CPAR included some positive

7

statements for delivering [contract data requirement lists], conducting weekly status meetings, and an overall Mission Success Rate (MSR) that continues to improve, there were significant adverse references noted." (AR 46977.) Aery had received "ratings of Unsatisfactory to Marginal in meeting schedule requirements during the most recent performance periods." (*Id.*)

The SSEB further noted that Aery had "received ratings of Marginal in meeting management requirements during the most recent performance periods." (AR 46979.) The SSEB also found that "[a]lthough there were some positive references . . . there were significant adverse findings noted." (*Id.*) These adverse findings included "delays in operation, misrepresentation of available aircraft, unprepared to perform services, personnel not available 24/7, and communication/support issues." (*Id.*) The overall record indicated "negative trends of providing quality [m]anagement to the Government on [the predecessor contract]." (*Id.*) The SSEB concluded that "[a]lthough the Offeror provided examples of changes it implemented to improve its performance and some of those improvements have led to positive results, the Offeror still does not comply with the PBWS requirements for [the predecessor contract] and did not demonstrate [s]ystemic [i]mprovement." (AR 46983; *see also* AR 46988.)

The SSEB also considered that the predecessor contract had been "awarded as a Joint Venture" between Aery and Mountain, but that "Aery . . . was the only entity that performed under this contract." (AR 46977.) Even so, based on its review of Aery's "recent/relevant performance record," the SSEB had only "a low expectation that [Aery would] successfully perform the required effort" and awarded Aery an overall past performance rating of "Limited Confidence." (AR 46988.)

### b.    Phoenix's Past Performance

Phoenix's past performance was evaluated based on its performance on five relevant contract references, including: commercial aviation services in support of Naval Sea Systems Command; Navy EW aircraft services; and Navy business-jets contract air services. (AR 46955.)

In its review, the PPET "did not identify any adverse past performance findings within the Quality, Schedule, or Management assessment areas of CR P1 through P5." (AR 46996.) The PPET noted, however, that Phoenix had "experienced a mishap tragedy on [one of its references] during the 11/30/2022-11/29/2023 reporting period."[2] (*Id.*) Even so, the PPET found that, despite this loss of an aircraft, Phoenix had maintained "schedule and operations and received an overall Exceptional rating for the entire reporting period." (*Id.*)

---

[2] On May 10, 2023, an aircraft operated by Phoenix was destroyed when it was involved in an accident near San Clemente Island, California. After an odor was detected in the cabin, smoke and fire were observed on the aircraft by a nearby aircraft. An emergency was declared, and the aircraft attempted to return to the San Clemente Island Naval Auxiliary Landing Field. The aircraft crashed, and its wreckage was found one mile offshore. Two pilots and an additional crewmember were presumed fatally injured. (AR 47352-55.)

Phoenix received ratings of "Satisfactory to Very Good in the meeting quality requirements assessment area" due to its record of past performance, reflecting a "positive trend of exceeding schedule requirements." (AR 46989.) Phoenix also received ratings of "Satisfactory" to "Exceptional" for the assessment areas of managing the contracted efforts and of meeting schedule requirements. (AR 46991; AR 46993.)

Following the PPET's evaluation, the SSEB found that Phoenix had "demonstrated positive Past Performance with meeting technical requirements . . . with no adverse performance demonstrated." (AR 46989.) The SSEB concluded that "[b]ased on the Offeror's recent/relevant performance record, the Government has a high expectation that the Offeror will successfully perform the required effort. As a result, the overall Past Performance rating for this Offeror is Substantial Confidence." (AR 46996.)

### 2. Technical Evaluation

The TET evaluated each proposal to determine each offeror's "understanding of, approach to, and ability to meet the solicitation requirements." (AR 46997.) The technical evaluation included an assessment of the following elements: (1) Aircraft Performance Requirements; (2) Aircraft Modification Plan; (3) Airworthiness Data; and (4) Integrated Master Schedule. (*Id*.) Offerors were advised that any assessed deficiency would render the offer ineligible for award, and that a proposal with "a Technical Rating of 'Unacceptable' or 'Marginal,' or a Technical-Risk Rating of 'High' or 'Unacceptable' was considered unawardable" and would be eliminated from the competition. (AR 46999.)

The Navy assigned each offeror two technical ratings. First, the Navy assessed the offerors' technical solution and, second, it conducted a technical risk-assessment to evaluate the potential for disruption of the schedule, increased costs, or unsuccessful contract performance. (AR 46998.) The Navy used the following standards to assign its ratings.

**TECHNICAL EVALUATION RATING DEFINITIONS**

Technical Ratings: The Technical Rating assignments reflect the Government's assessment of the Offeror's technical solution for meeting the Government's requirement.

| Color Rating | Adjectival Rating | Description |
|---|---|---|
| Blue | Outstanding | Proposal demonstrates an exceptional approach and understanding of the requirements, contains multiple strengths and/or at least one significant strength. |
| Purple | Good | Proposal demonstrates a thorough approach and understanding of the requirements and contains at least one strength or significant strength. |
| Green | Acceptable | Proposal demonstrates an adequate approach and understanding of the requirements |
| Yellow | Marginal | Proposal has not demonstrated an adequate approach and understanding of the requirements. |
| Red | Unacceptable | Proposal does not meet requirements of the solicitation and, thus, contains one or more deficiencies and is un-awardable. |

(*Id*.)

9

**TECHNICAL RISK ASSESSMENT DEFINITIONS**

Technical Risk Rating: The risk assignments reflect the Government's assessment of potential for disruption of schedule, increased costs, degradation of performance, the need for increased Government oversight, or the likelihood of unsuccessful contract performance.

| Rating | Description |
|---|---|
| Low | Proposal may contain weakness/weaknesses which have low potential to cause disruption of schedule, increased cost, or degradation of performance. Normal contractor emphasis and normal Government monitoring will likely be able to overcome any difficulties. |
| Moderate | Proposal contains a significant weakness or combination of weaknesses which may have a moderate potential to cause disruption of schedule, increased cost, or degradation of performance. Special contractor emphasis and close Government monitoring will be able to overcome any difficulties. |
| High | Proposal contains a significant weakness or combination of weaknesses which is likely to have high potential to cause significant disruption of schedule, increased cost, or degradation of performance. Special contractor emphasis and close Government monitoring will unlikely be able to overcome any difficulties. |
| Unacceptable | Proposal contains a deficiency or a combination of significant weaknesses that causes an unacceptable level of risk of unsuccessful performance. |

60

(*Id.*)

### a.    Aery's Technical Proposal

Aery proposed 12 aircraft to meet the solicitation's requirements.  (AR 46904.)  Each of Aery's proposed aircraft required a different set of modifications to become contract compliant. (*Id.*)  None of Aery's aircraft were authorized to carry the ALQ-164 pod.  Aery's aircraft required either physical modifications to install a hardpoint to which an external pod could be attached and/or modification to the supplemental type certificate (STC) to allow for the necessary modification of the proposed aircraft.[3]

In its request for FPRs, the Navy noted that Aery's proposal had failed to demonstrate that its 12 proposed aircraft "were approved to carry the ALQ-164 pod in accordance with [the] PBWS."  (AR 46223.)  Aery recognized this shortcoming and understood that it would have to modify its aircraft through both physical modification and a modification to the STC.  To comply with the PBWS's requirement to carry the ALQ-164 pod, Aery indicated that it intended to contract directly with Avcon Industries, Inc. ("Avcon"), a company which designs, manufactures, installs, and tests FAA-approved aircraft modifications for a wide range of operational roles.[4]  (AR 46340.)  According to Aery's proposal, the ALQ-164 pod was the only "pod not currently approved in the Avcon hardpoint and Airplane Flight Manual Supplements

---

[3] An STC is a type certificate (TC) issued when an applicant has received FAA approval to modify an aeronautical product from its original design.  An STC incorporates by reference the underlying TC and approves not only the modification but also how the modification affects the original design.  Federal Aviation Administration, *Supplemental Type Certificates*, https://www.faa.gov/aircraft/air_cert/design_approvals/stc (last visited November 20, 2025).

[4] Avcon Industries, Inc., *About-Avcon*, https://www.avconindustries.com (last visited November 20, 2025).

[("AFMS")] STC's which Aery has or will install as part of the modification plan." (AR 46334; AR 46346.)

To address its proposal's shortcoming, Aery proposed that Avcon would add the ALQ-164 to the stores approved for STC ST00564WI. (*Id.*) Aery represented that it had "researched thoroughly and engaged Avcon engineering staff seeking carriage approval for this underwing store." (AR 47272.) Aery noted that it had "had detailed communications with Avcon engineering to add the ALQ-164 pod to [its] approved stores STC ST00564WI which approves the carriage of external stores as required by PBWS." According to Avcon, "[t]he addition of the ALQ-164 pod to our approved stores STC [would] take approximately 45 days." (AR 46346.) Second, Aery proposed to "install the Avcon Industries Wing Hardpoint STC SA1670CE and the underwing pods approval per FAA STC #ST00564WI mitigating an unapproved STC concern." (AR 46340.)

In its evaluation, the TET identified no significant strengths in Aery's proposal and one risk reducer. (AR 47008.) The TET also found one significant weakness, three uncertainties, and one deficiency. (*Id.*) The TET concluded that Aery's "inability to demonstrate a cohesive [tasking] plan as a flaw that appreciably increased the risk of unsuccessful contract execution." (AR 47009.) The TET also assessed a deficiency because Aery "failed to demonstrate, with the [STCs] and/or the [AFMSs] it referenced, that its proposed aircraft [ ] were approved to carry the ALQ-164 pod in accordance with PBWS Appendix C Table 3." (AR 47016.) As a result of the TETs review of Aery's proposal, evaluation notice responses, and FPR, the TET determined that Aery's proposal was unawardable. (AR 47005.)

Following the TET's evaluation, the SSEB assigned both Aery's technical and technical-risk ratings as "Unacceptable." (AR 47000.) The SSEB concluded that while Aery's FPR reflected that the six of Aery's proposed aircraft with a current Avcon STC would be able to carry the ALQ-164 pod prior to FOC, Aery had not shown that it could modify its other six proposed aircraft not already equipped with an Avcon STC, because the six non-compliant aircraft were equipped with an STC owned by Flight International, not Avcon. (AR 47005; AR 47016.) As a result, the SSEB gave Aery a deficiency for its "material failure to meet the requirements in the solicitation" by failing to demonstrate that six of its 12 proposed aircraft could be approved to carry the ALQ-164. (AR 47005.)

The Navy found that Aery's proposed solution was:

> acceptable for aircraft N10FN, N12FN, N16FN, N18FN, N301EW, and N302EW that would have an AVCON STC for carriage of underwing stores. However, the Offeror cited STC ST010217SC (a Flight International STC) for aircraft N39FN, N51FN, N52FN, N53FN, N83FN, and N84FN. STC ST010217SC does not list the carriage of the ALQ-164 as an approved underwing store in accordance with PBWS Appendix C Table 3. Although the Offeror proposed to have AVCON add the ALQ-164 to the AVCON STC ST00564WI, the Offeror did not demonstrate it could modify the Flight International STC ST010217SC to add the ALQ-164.

11

Therefore, the Offeror failed to demonstrate compliance with the requirement to carry the ALQ-164 pod for aircraft tail numbers N39FN, N51FN, N52FN, N53FN, N83FN and N84FN.

(AR 47016.)

### b.    Phoenix's Technical Proposal

Phoenix offered the Navy 10 aircraft: five aircraft it currently owned and five aircraft it planned to acquire.  (AR 19259.)  None of the five aircraft owned by Phoenix were approved to carry the ALQ-164 pod.  (AR 19274.)  Phoenix's proposal noted that the five aircraft it planned to acquire, would have to be modified via "STC amendment" to comply with the PBWS and carry the ALQ-164 pod.  (AR 19271.)  Phoenix proposed that the amendment could "be performed after contract award with a funded delivery order for the effort."  (*Id*.)

In its evaluation of Phoenix's proposal, the TET "identified zero Significant Strengths, zero Strengths, three Risk Reducers, zero Significant Weaknesses, zero Uncertainties, and zero Deficiencies."  (AR 42027.)  The SSEB found that Phoenix's proposal had three risk reducers, and no significant weaknesses, uncertainties, or deficiencies.  (AR 47029.)  As a result, the SSEB evaluated Phoenix's overall technical rating as "Acceptable," and its technical-risk rating as "Low."[5]  (AR 47019-29.)

The SSEB assigned Phoenix's proposal the following three risk reducers: (1) "[t]he Offeror received Risk Reducer #1 for its approved [Flight Operating Procedures], [Ground Operating Procedures], FAA Part 135 certified air carrier status, and FAA Part 145 Certificated Repair Station status"; (2) "[t]he Offeror received Risk Reducer #2 for utilizing experienced flight crews already performing relevant missions for DoD customers"; and (3) "[t]he Offeror received Risk Reducer #3 for its comprehensive aircraft procurement plan."  (AR 47029-30.)

As for Phoenix's proposal to modify its aircraft to meet the requirements of the PBWS, the SSEB noted that Phoenix planned to make use of "several STCs . . . to meet the PBWS" requirements, and that the aircraft listed in the proposal "were consistently presented across the Offeror's supporting documentation."  (AR 47023-24.)  The SSEB found that the information provided by Phoenix "demonstrated the Offeror's ability to comply with the requirements in PBWS . . . for" the specified aircraft.  (AR 47024.)

Overall, the SSEB found that Phoenix's "proposal demonstrated an adequate approach and understanding of the technical requirements" (AR 47029) and concluded that "[t]he Offeror's plan appeared reasonable, attainable, and technically feasible" and "met the Aircraft Modification Plan requirement."  (AR 47024.)

---

[5] The SSEB report includes inconsistencies in Phoenix's technical-risk rating.  It notes a technical-risk rating of Low in one location (AR 47029) but elsewhere it notes a technical-risk rating of Moderate.  (AR 47019.)  The discrepancy need not be resolved, and either rating is superior to Aery's.

### 3.  Final Contract Award and GAO Protest

After the SSEB completed its evaluation, the SSAC conducted its own analysis of the proposals and unanimously recommended awarding the CAS EW services contract to Phoenix as the offeror providing best value to the Navy.  (AR 47055; AR 47065-66; AR 47069.)

The SSAC found that "the advantages of [Phoenix's] proposal merit[ ] the additional cost/price premium of approximately $38M over Aery based on [Phoenix]'s better assessments in the most important factors; Corporate Experience, Past Performance, and Technical." (AR 47065.)  The SSAC also noted that "[e]ven if Aery was able to submit an awardable technical proposal, Aery would not overcome [Phoenix]'s significant advantage in both Corporate Experience and Past Performance, the two most important factors, and therefore, [Phoenix]'s proposal would remain the best value, all factors considered."  (*Id*.)

Finally, upon review of the evaluation documentation, the SSA concurred with the SSAC and selected Phoenix for the award.  (AR 47069.)  The source-selection-decision document was executed on March 4, 2025.  (AR 47067-69.)  On March 5, 2025, Phoenix was notified that the Navy had again awarded it the CAS EW services contract.  (AR 27231-33.)

On March 15, 2025, Aery filed a protest with the Government Accountability Office ("GAO").  (AR 47237-54.)  The Navy issued a stop-work order on March 18, 2025. (AR 47234.)  Aery withdrew its GAO protest on May 19, 2025, and the Navy lifted the stop-work order on May 20, 2025.  (AR 48398-400; AR 47236.)  Aery then filed this protest.

## II.    PROCEDURAL HISTORY

Aery filed its complaint on June 16, 2025.  (ECF 1.)  On August 20, 2025, Aery moved to supplement the administrative record with a February 2025 briefing it had prepared for the Navy and moved for leave to amend its complaint to add a claim for disparate treatment.  (ECF 31; ECF 32.)  The motion to supplement the record was deferred until the argument on the merits. On August 20, 2025, the plaintiff moved for judgment on the administrative record.  (ECF 33.) On September 15, 2025, the defendant cross-moved for judgment on the administrative record. (ECF 37.)  Although it had intervened as a defendant, Phoenix filed no motion and submitted no briefs.  On September 16, 2025, Aery's motion for leave to amend its complaint was granted. (ECF 39.)  On September 16, 2025, Aery responded to the defendant's motion for judgment on the administrative record (ECF 43), and the defendant replied on September 30, 2025.  (ECF 44.) Oral argument, which had been scheduled for October 21, 2025, was postponed due to the lapse in appropriations.  The argument was held on November 19, 2025.

## III.   JURISDICTION AND STANDING

Under the Tucker Act, the Court of Federal Claims has jurisdiction over "an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1).

Aery challenges the Navy's award of the CAS EW services contract to Phoenix, alleging that the Navy improperly evaluated its proposal and that it was prejudiced by the Navy's errors. Accordingly, Aery's claims fall within the court's bid-protest jurisdiction.

For a plaintiff to have statutory standing in a bid protest, it must be an "interested party." 28 U.S.C. § 1491(b)(1); see *CACI, Inc.- Fed. v. United States*, 67 F.4th 1145, 1152 (Fed. Cir. 2023). To qualify as an interested party, an offeror must allege facts, that, if true, "establish that it (1) is an actual or prospective bidder, and (2) possesses the requisite direct economic interest." *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006); *see also Percipient.ai, Inc. v. United States*, 153 F.4th 1226, 1235 (Fed. Cir. 2025), *cert. petition filed*, No. 25-428 (Oct. 6, 2025).

In determining whether a protestor has alleged facts demonstrating the "requisite direct economic interest," a court must decide whether those alleged facts show the protestor was prejudiced by the alleged errors. *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996). To establish prejudice for standing purposes in a post-award bid protest, the protestor's complaint must "show that there was a 'substantial chance' it would have received the contract award but for the alleged error in the procurement process." *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (quoting *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (citation omitted)). To determine whether it has standing, a protester's allegations are assumed to be true. *See Am. Relocation Connections, LLC v. United States*, 789 F. App'x 221 (Fed. Cir. 2019).

Aery is an actual bidder for the CAS EW services contract. Assuming its allegations to be true, Aery, as the lowest bidder and provider of services on the predecessor contract, would have had a substantial chance of receiving the contract award if it can prove the Navy made the errors alleged. As a result, the plaintiff has satisfied the requirements for standing.

## IV.    STANDARD OF REVIEW

On a motion for judgment on the administrative record under Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"), the court's review is limited to the administrative record, with findings of fact made as in a trial on a paper record. *See Bannum*, 404 F.3d at 1353-56. The court must determine whether a party has met its burden of proof based solely on the evidence in the administrative record. *Id.* at 1355-56. Genuine issues of material fact will not foreclose judgment on the administrative record. *Id.*; *see also Palantir USG, Inc., v. United States*, 904 F.3d 980, 989 (Fed. Cir. 2018).

The Administrative Procedure Act ("APA") "supplies the standard of review in bid protests." *Oak Grove Techs., LLC v. United States*, 116 F.4th 1364, 1374 (Fed. Cir. 2024) (*See* 28 U.S.C. § 1491(b)(4); *see also Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009)). The APA standard "asks whether the agency's actions were 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Oak Grove*, 116 F.4th at 1374. (quoting 5 U.S.C. § 706(2)).

Bid protests require a court to conduct a two-step analysis. *Bannum*, 404 F.3d at 1351. First, the court must determine whether the government's conduct is "arbitrary and capricious" or "not in accordance with law" under 5 U.S.C. § 706. *Id.* (citing 5 U.S.C. § 706; 28 U.S.C. § 1491(b)(4)). To find that an agency acted arbitrarily and capriciously, a court must "determine whether '(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" *Weeks Marine v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009) (quoting *PGBA, LLC v. United States*, 389 F.3d 1219, 1225 n.4 (Fed. Cir. 2004)).

Under the APA's arbitrary-and-capricious standard, a court gives considerable deference to the agency's ultimate determination and the individual decisions that went into it. *See Safeguard Base Operations, LLC v. United States*, 989 F.3d 1326, 1343 (Fed. Cir. 2021) (citing *PAI Corp. v. United States*, 614 F.3d 1347, 1351 (Fed. Cir. 2010) (cleaned up) ("[p]rocurement decisions are subject to a highly deferential rational basis review")). Thus, a reviewing court may not substitute its judgment for that of the agency but, instead, evaluates the basis for the agency's decision to determine whether it is reasonable, supported by the record before the agency, and consistent with the law. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

It is not enough for a protester to prevail on the first prong of the test to prevail on the protest. A protester must also satisfy the second prong of the analysis, under which a reviewing court must "determine, as a factual matter, if the bid protester was prejudiced by that conduct." *Bannum,* 404 F.3d at 1351. "[T]he second step is always required before setting aside a bid award, regardless of whether the error identified at the first step was arbitrary and capricious action or, instead, a violation of law." *Sys. Stud. & Simulation, Inc. v. United States*, 22 F.4th 994, 997 (Fed. Cir. 2021).

## V.    MOTION TO SUPPLEMENT THE RECORD

Bid protests are typically resolved on review of the administrative record before the agency. That administrative record may be supplemented only when the materials sought to be added are necessary for effective judicial review. A court evaluates the reasonableness and lawfulness of an agency's decision based on the record before the agency and not "some new record made initially in the reviewing court." *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379 (Fed. Cir. 2009). Supplementation of the administrative record "should be limited to cases in which the omission of extra-record evidence precludes effective judicial review," *id*. at 1380 (cleaned up), because "the focal point for judicial review [under the APA] should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). The limit on supplementing the record before the procuring agency prevents a protester from "convert[ing] the 'arbitrary and capricious' standard into effectively de novo review." *Murakami v. United States*, 46 Fed. Cl. 731, 735 (2000), *aff'd*, 398 F.3d 1342 (Fed. Cir. 2005).

Aery seeks to include in the administrative record a February 2025 PMR that offers information about the plaintiff's performance on the predecessor contract. Aery argues that its PMR is necessary for effective judicial review because it includes vital information that "was

15

simply too relevant and close to hand to ignore."[6]  (ECF 32 at 3) (citing *Seattle Sec. Servs., Inc. v. United States*, 45 Fed. Cl. 560, 569 (2000)).  Specifically, Aery argues that information in the PMR is needed to allow a determination of whether the Navy's evaluation of Aery's past performance was arbitrary and capricious.  Aery argues that the PMR it seeks to add to the administrative record would demonstrate that Aery ended calendar year 2024 with a 95-percent mission success rate ("MSR") on the predecessor contract, and that its MSR improved throughout the predecessor contract.  (ECF 32 at 2; ECF 32-1 at 7.)

The administrative record is not, however, missing the information Aery seeks to add; it already contains multiple documents showing that Aery's MSR improved throughout the predecessor contract and, as of August 2024, reflected a 95 percent MSR for 2024.  (AR 45835, AR 45839, AR 45846, AR 45889-920, AR 48284-91).  Indeed, the same MSR chart found in Aery's PMR is found elsewhere in the administrative record, although the chart in the record ends in August 2024, rather than February 2025.  (AR 45846, AR 45920, AR 48287.)  One of these charts even projects that Aery would achieve a MSR of 95 percent or better from August 2024 through the end of that year and into 2025.  (AR 45901.)  The PMR is therefore redundant of evidence specifically considered by the Navy during its evaluation of Aery's proposal.  Its inclusion is not necessary for effective judicial review.

Aery's PMR would only add to the record Aery's actual MSR for the period between September 2024 to February 2025.  This information is cumulative and would merely corroborate the trend of the improvement in Aery's performance already reflected in the administrative record and acknowledged by the SSEB.  Here, the PMR is not required to ensure effective judicial review.

To support its motion, Aery relies on *Seattle Security Service*, 45 Fed. Cl. at 569.  In that case, Judge Allegra concluded that it was improper for a contracting officer to evaluate the plaintiff's past performance on one of its contracts but not on a second contract, even though the plaintiff had cited both contracts for its past performance in its offer.  In contrast, Aery's PMR is not a separate contract.  The PMR here is merely a semi-annual presentation in which the contractor provides the agency with information on four items: (1) an overview of the work accomplished; (2) the identification and review of problems encountered; (3) the identification and discussion of anticipated problems; and (4) feedback on CAS missions.  (AR 237.)  The failure to include in the record a document, prepared by Aery itself and not considered by the Navy, reflecting information already reflected effectively in the record presents a completely different situation than the failure of a contracting officer to consider performance on an entire contract that was before the agency.  *Seattle Security Services* does not support the inclusion of Aery's PMR in the record.  *See also Insight Pub. Sector, Inc. v. United States*, 157 Fed. Cl. 398, 410 (2021) ("[c]ourts typically limit the universe of information [ ] consider[ed] 'too close at hand' to

---

[6] Under the "too close at hand" doctrine, "[i]t is well-established that 'some information is too close at hand to require offerors to shoulder the inequities that spring from an agency's failure to obtain, and consider, the information.'"  *KACE Co., LLC v. United States*, 167 Fed. Cl. 192, 208 (2023) (quoting *Insight Pub. Sector, Inc. v. United States*, 157 Fed. Cl. 398, 410 (2021)).

documents in the possession of the contracting agency or information that is personally known to the contract evaluator.")

Aery's motion to supplement the administrative record is denied.

## VI.    DISCUSSION

### A.    Technical Evaluation

#### 1.    The Navy's Conclusion Does Not Lack a Rational Basis

The Navy deemed Aery's technical-risk rating as "Unacceptable" because of a deficiency that resulted "in a material failure of [Aery's] proposal to meet Government requirements and increase[d] the risk of unsuccessful performance to an unacceptable level." (AR 47017.) The Navy found that Aery's proposal failed to demonstrate that it could bring the six proposed aircraft with the Flight International STC into compliance with the PBWS. Aery argues that the Navy had no basis to assign the deficiency and thus "no basis to deem Aery unawardable." (ECF 33 at 11.)

Aery argues that the Navy's assessment is arbitrary and capricious because the Navy issued a deficiency based "on something that was not required in the Solicitation." (*Id.* at 14.) Specifically, that at the time of award, it was not required to have the six aircraft with the Flight International STC approved to carry the ALQ-164 pod. Instead, under the solicitation, Aery argues that it was only required to submit a plan detailing the modifications that would ultimately bring its proposed aircraft into compliance with the PBWS. Aery supports its argument that its proposal provided such a plan by identifying six aircraft with the Avcon STC, that were able to fly with the ALQ-164 pod with STC modifications from Avcon. Aery claims that it also proposed to modify and bring into compliance the six aircraft with the Flight International STC installed. (*Id.* at 14-15.) In other words, Aery asserts that it planned to install and modify the Avcon STC on the six aircraft with the Flight International STC which would allow for carriage of the ALQ-164 on all its proposed aircraft. Aery argues that the Navy's assignment of a deficiency was based on a misreading of its proposal because, under its proposal, the aircraft with the Flight International STC would comply with the PBWS. (ECF 43 at 6, 10.)

Aery relies on two specific provisions of its FPR to support its argument that it would install and modify the Avcon STC on the aircraft with the Flight International STC. First, in a provision labeled "Technical Approach" Aery noted:

> To further reduce the Navy's FPR issues relating to STC uncertainties, Aery will purchase and install the Avcon Industries (Avcon) Wing Hardpoint STC SA1670CE and the underwing pods approval per FAA STC #ST00564WI.

(AR 46332.)

In another section of its FPR, entitled "Aircraft Hardpoint Modifications and Approved Underwing Pods," Aery included the following language:

17

[The ALQ-164 pod] is unique because it's the only pod not currently approved in the Avcon hardpoint and AFMS STC's which Aery has or will install as part of the modification plan.

(AR 46346.)

Despite these representations, the Navy found Aery's proposal deficient.  According to the Navy, Aery failed to propose a solution for carriage of the ALQ-164 on the six aircraft with the Flight International STC.  This Flight International STC did not list the ALQ-164 pod as an approved underwing store.  (AR 47005.)  In reviewing Aery's proposal, the Navy concluded that "[Aery] did not demonstrate it could" modify the Flight International STC to allow carriage of the ALQ-164.  (AR 47016.)  The SSEB explained:

> The Offeror claimed that all proposed aircraft met, or would meet after modifications, the requirement for External Pod Mounts listed in PBWS Appendix C Table 3, which included the carriage of the ALQ-164 pod. The Offeror's Vol 4 Tech FPR, paragraph 1.0, stated the Offeror "had detailed communications with [Avcon] engineering to add the ALQ-164 pod to their approved stores STC ST00564WI," and proposed "to add the ALQ-164 to the AVCON STC post contract award and prior to FOC and operation of the equipment." However, six of the Offeror's aircraft were proposed with a Flight International STC ST010217SC for carriage of underwing stores. The Flight International STC ST010217SC does not allow for carriage of the ALQ-164 as an underwing store and the Offeror did not propose a solution for carriage of the ALQ-164 on these six aircraft. The TET identified the Offeror's failure to demonstrate compliance with this requirement as Deficiency #1.

(AR 47004-5.)

Aery misunderstands the basis for the deficiency the Navy assigned to its proposal.  The deficiency was not assigned because the six aircraft with the Flight International STC could not carry the ALQ-164 pod *at the time of award*.  Instead, the deficiency was assigned because Aery's proposal failed to explain how, *at any time*, it could bring the six aircraft with the Flight International STC into compliance.

Both the content of and the explanation for the Navy's assignment of a deficiency are clear and do not support Aery's argument.  Aery's proposed modification to the six aircraft with the Flight International STC failed to demonstrate to the Navy's satisfaction that these six aircraft would ever be certified to carry the ALQ-164 pod.  The SSEB understood that Aery's proposal "indicate[d] that [Aery] would add the ALQ-164 . . . post contract award and prior to the FOC."  (AR 47016.)  Aery's proposed partial solution was to work with Avcon to add the ALQ-164 pod to a specific Avcon STC identified in the proposal.  The Navy found this proposed modification "acceptable for [six identified] aircraft," because those aircraft would have "an AVCON STC for carriage of underwing stores."  (*Id.*)  If the Navy's assignment of a deficiency were based, as Aery argues, on the fact that Aery's aircraft were not approved to carry the ALQ-

164 pod at IOC, then the Navy would not have found Aery's proposed modification for aircraft with the Avcon STC to have been acceptable.

Instead, the Navy issued a deficiency because Aery's proposal failed to demonstrate that it could bring into compliance the six aircraft with the Flight International STC. Aery proposed only a plan to work with Avcon to add the ALQ-164 to the aircraft with the Avcon STC. (AR 46346.) As a result, Aery's proposal failed to demonstrate that Aery planned to, or even could, add the ALQ-164 to the aircraft with the Flight International STC.

The two statements on which Aery relies, however, address only generally the use of the Avcon STC on Aery's aircraft and do not specifically resolve the Navy's concerns. Aery lumps both the aircraft with the Avcon STC and the aircraft with the Flight International STC together in its proposal, even though each set of aircraft required different treatment to comply with the PBWS. Aery's failure to identify and to specify the different treatments required to bring these two distinct sets of aircraft into compliance is the basis for the Navy's decision. Neither the FPR language Aery cites nor anything else in Aery's proposal made clear that Aery planned to install the Avcon STC on the six aircraft with the Flight International STC. Aery's proposal also failed to demonstrate that Aery planned to, or even could, modify the aircraft with the Flight International STC, leaving the six aircraft non-compliant with the PBWS.

"Offerors carry the burden of presenting 'an adequately written proposal, and an offeror's mere disagreement with the agency's judgment concerning the adequacy of the proposal is not sufficient to establish that the agency acted unreasonably.'" *Software Eng'g Servs., Corp. v. United States*, 85 Fed. Cl. 547, 554 (2009) (quoting *United Enter. & Assocs. v. United States*, 70 Fed. Cl. 1, 26 (2006)). Whether or not Aery *intended* to replace the Flight International STC with the Avcon STC is not relevant to determining whether the Navy's determination, based on what Aery included in its final proposal, was arbitrary and capricious.

The Navy determined that Aery's proposal was insufficient to allow it to conclude that Aery had the ability to bring its 12 proposed aircraft into compliance with the PBWS. Under Aery's modification plan, the Navy determined that only six of Aery's proposed aircraft were able to fly with the ALQ-164 pod installed. Because Aery did not sufficiently specify how it would bring into compliance the six aircraft with the Flight International STC installed, the Navy concluded that Aery had not proposed a satisfactory plan to carry the ALQ-164 pod on all of its proposed aircraft.

The Navy's decision to issue Aery a deficiency was adequately explained, and that explanation is supported by the record. Aery's claim is rejected.

### 2. Disparate Treatment

Aery's claim of disparate treatment is also rejected. Aery argues that the Navy treated its proposal disparately by assigning Aery a deficiency for failing to demonstrate "that [its] aircraft 'were approved to carry the ALQ-164 pod' at the time of award (IOC)," but not assigning

Phoenix a deficiency for failing to have "five of its proposed aircraft . . . approved to carry the ALQ-164 pod" at the time of award.[7]  (ECF 33 at 18-19.)

An agency acts in an arbitrary and capricious manner when it treats like cases dissimilarly.  *See Mission1st Grp., Inc. v. United States*, 144 Fed. Cl. 200, 215 (2019) ("It is well established that treating like cases in an unequal fashion is a hallmark of arbitrary decision-making.").  To prevail on a claim of disparate treatment, "a protestor must show that the agency unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals."[8]  *Off. Design Grp. v. United States*, 951 F.3d 1366, 1372-73 (Fed. Cir. 2020).  "If a protestor does not meet this threshold showing, then the court should dismiss the claim, otherwise it 'would give a court free rei[]n to second-guess the agency's discretionary determinations underlying its technical ratings.'"  *AccelGov, LLC v. United States*, 164 Fed. Cl. 345, 362 (2023) (quoting *Office Design Grp.*, 951 F.3d at 1373).

The Navy determined that Aery's proposal failed to demonstrate that it would successfully bring six of its proposed aircraft into compliance with the solicitation, because neither Aery nor Avcon owned the STC that required modification.  Aery argues that, at the time their proposals were submitted, both Aery and Phoenix each had aircraft that were not approved to carry the ALQ-164 pod IOC, and both had to provide modification plans to bring their noncompliant aircraft into compliance FOC.  The similarities between the two proposals, however, end there.

For six of its aircraft, Aery proposed to have Avcon add carriage of the ALQ-164 to the Avcon STC.  As for the six aircraft with the Flight International STC, Aery's proposal failed to set out in a sufficient and clear manner that Aery could modify and bring into compliance its aircraft with the Flight International STC.  Phoenix proposed to obtain approval for its five aircraft to carry the ALQ-164 pod by acquiring itself multiple STCs and otherwise seek the necessary FAA approval of modifications to its own STCs to allow for carriage of the ALQ-164 pod.  (AR 19261; AR 19275.)

Aery's disparate treatment argument ignores that Phoenix's plan to purchase and modify the necessary STCs is readily distinguishable from Aery's plan to amend an existing STC installed on only six of its aircraft and to seek to install that STC on six additional aircraft

_____

[7] In arguing the disparate treatment point, Aery also takes issue with the brevity with which Phoenix detailed its modification plan for the aircraft that were not configured to carry the ALQ-164 pod by FOC.  (ECF 33 at 20.)  The length of Phoenix's proposal, however, is not relevant to whether the Navy treated the two proposals unequally in violation of the law.

[8] The test for proving disparate treatment set out in *Office Design Group* includes a second prong: a protester "may also prevail by showing that the agency inconsistently applied objective solicitation requirements between it and the other offerors, such as proposal page limits, formatting requirements, or submission deadlines."  951 F.3d at 1372-73.  Because Aery does not argue that the Navy inconsistently applied an objective solicitation requirement, this second aspect of the test is not addressed.

currently installed with an STC from an uninvolved third party, Flight International.  Because the proposals are substantively distinguishable, Aery is unable to show that the Navy treated its proposal disparately.

**B.    Past Performance**

**1.    Negative CPAR for the Joint Venture**

Aery argues that the Navy "entirely failed" to consider that the negative CPAR on which the Navy relied for its evaluation was prepared not for Aery but for SAO, the joint venture that was awarded the predecessor contract.  Aery asserts that had the Navy considered the "remarkable commitment and determination" shown by Aery in performing under the predecessor contract after losing its joint-venture partner, Aery's past performance evaluation rating would have improved.  (ECF 33 at 22-23.)  Aery also argues that "the evaluators totally failed to consider an important aspect of past performance," *i.e.*, the improvement in Aery's performance over time.  (*Id*. at 27) (citing 48 C.F.R. § 15.305(a)(2) (explaining that "general trends in [a] contractor's performance shall be considered").

Aery fails to demonstrate that the Navy failed to consider either Aery's "remarkable commitment and determination" after losing its joint-venture partner or the general trend in the quality of Aery's past performance.

An agency's decision is "arbitrary and capricious when the agency 'entirely failed to consider an important aspect of the problem. . . .'"  *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1989)).  Aery bears a heavy burden in making an arbitrary and capricious showing because in "consider[ing] a bid protest challenge to a past performance evaluation conducted in the course of a negotiated procurement [under FAR part 15], 'the greatest deference possible is given to the agency.'"  *FirstLine Transp. Sec., Inc. v. United States*, 100 Fed. Cl. 359, 396 (2011) (quoting *Univ. Rsch. Co. v. United States*, 65 Fed. Cl. 500, 505 (2005), in turn quoting *Gulf Grp. Inc. v. United States*, 61 Fed. Cl. 338, 351 (2004)).

The record reflects the Navy was both aware of Aery being the only entity to perform under the joint venture and adequately considered that fact.  Aery itself acknowledges that it provided comments to the CPAR, and "[its] comments show that the Navy was amply aware of a significant aspect of past performance—Aery's commitment and determination to overcome adversity and provide a significant benefit to the Navy."  (ECF 33 at 24 (citing AR 48401-34).)  The SSEB's past-performance evaluation, in considering Aery's adverse past performance on the predecessor contract, noted that the predecessor contract had been "awarded as a Joint Venture between Aery Aviation & Mountain Aviation as [SAO] JV," but that "Aery Aviation was the only entity that performed under this contract."  (AR 46979.)  Thus, the record specifically reveals that the Navy was aware of the history in the performance of the predecessor contract and acknowledged that the CPAR was written for the SAO joint venture.

The final SSEB's assessment of Aery's past performance also acknowledged "examples of changes [Aery] implemented to improve its performance."  (AR 46983.)  The SSEB included

21

a list, provided by Aery, of these examples of improved performance such as schedule improvements. For instance, the list noted that Aery's performance on the predecessor contract showed a "difficult but successful trend from a 72 [percent] MSR in the first year of the contract to an average of 90 [percent] for 2023 and highs of 97 [percent] and 100 [percent] in recent months." (*Id.*) The SSEB also cited a PPQ for the period from May 13, 2024, to October 15, 2024, after Aery's CPAR, and noted that Aery's performance improvements "have led to positive results." (AR 46983-84.) Despite Aery's improved performance, however, the SSEB concluded that Aery's "changes [ ] did not resolve or correct the performance problems documented throughout th[e] Past Performance assessment." (AR 46986.)

The improvements to Aery's performance on the predecessor contract reflect the trends that Aery argues the Navy failed to consider in evaluating its past performance. Aery's argument ignores the Navy's express consideration of the factors Aery asserts were not considered.

Aery also had ample opportunity to address the adverse information regarding past performance through two evaluation notices. Aery responded to both notices and included 49 attachments in total on both responses. In addressing the issues identified in the PPQ, Aery "noted the root cause of the PPQ issues as being related to 1) Withdrawal of Mountain Aviation as a Joint Venture partner, 2) Impact of COVID-19 and 3) Formal SOP for Communications/NAS JAX deployments." (*Id.*) Again, Aery's assertion that the Navy failed to consider the hardship Aery faced surrounding the withdrawal of Mountain from the joint venture and Aery's resilience in performing under the predecessor contract is contradicted by the record.

The SSEB concluded that:

> [a]lthough the Offeror demonstrated efforts to improve its performance through increased pilot hiring, meeting the number of EA aircraft required, a partial IOC SOJ aircraft, and an improved overall MSR, the Offeror continues to fail to meet the CR P1 contractual, performance, and schedule requirements. Therefore, the Offeror did not demonstrate Systemic Improvement.

(AR 46988.)

This conclusion is thoroughly explained and grounded in the record. It reflects consideration of the factors that Aery asserts were ignored. They were not. The Navy's conclusion is not arbitrary and capricious.

## 2. The Navy Did Not Fail to Apply the Solicitation's Definition of "Relevancy"

Aery's final contention is that the Navy failed to apply the solicitation's definition of "relevancy" by not considering Aery's recent performance under the predecessor contract more relevant than its earlier performance. Aery argues that the Navy did not properly weigh its recent performance and, as a result, failed to apply correctly the solicitation's evaluation criteria. The solicitation specified that "[i]n general, the Government considers recent performance more relevant than older performance." (AR 3811.) Aery argues that the Navy relied on the 2023

CPAR rather than the more recent information in Aery's September 23, 2024, response to the CPAR.  (ECF 33 at 24.)

Aery's contention is rejected for two reasons.

First, Aery's argument relies on its February 2025 PMR that Aery sought to add to the administrative record.  Aery's motion was denied in Section V, above.  The evidence on which Aery seeks to rely may not be considered to support this argument because the existing administrative record captures both the trend and substance of Aery's performance improvements.

Second, Aery inaccurately describes the Navy's evaluation of its proposal.  In support of its final argument, Aery asserts that the Navy based its evaluation on the 2023 CPAR and overlooked its subsequent performance improvements.  Although the Navy's past-performance evaluation did not cite the documents Aery references to support its argument, the Navy's evaluation did specifically refer to information about the improvement in Aery's performance following the 2023 CPAR.  As already noted, the Navy referred to aspects of Aery's performance through the February 2025 SSEB report.  While these references included favorable aspects of Aery's improved performance, they also noted recent failures.  For example, according to the SSEB, Aery's PPQ for the period of May 13, 2024 to October 15, 2024 noted that "'[s]ince 13 May 2024, [Aery]'s aircraft operations for Contracted Air Services (CAS) Type II aircraft (Electronic Attack (EA) & Target Banner Tow (TBT)) services have failed to modify all aircraft to comply with the configuration requirements as prescribed by the contract's Performance Based Work Statement (PBWS).'"  (AR 46974.)

The SSEB's evaluation considered PPQs for the period running through October 15, 2024, and considered Aery's May 24, 2024, and November 8, 2024, responses to evaluation notices.  (AR 46974-88.)  Moreover, the SSEB's evaluation specified the relevant Period of Performance ("PoP") for each area in which Aery was evaluated.  These PoPs often cover dates following the 2023 CPAR, including through October 15, 2024.  (AR 46974-80.)

Aery's argument that the SSEB should have addressed the portion of its December 2024 response to the CPAR noting that Aery's MSR was trending upward, and that "Aery was more recently in compliance with the MSR of 95 [percent]" (ECF 43 at 15), is also unavailing, because that information *was* addressed in the SSEB report.  The SSEB report reflects that the Navy was aware of and considered the improvement in Aery's MSR in addition to its 2023 CPAR.  The SSEB's past-performance evaluation noted that although Aery failed to "demonstrate Systemic Improvement," it did demonstrate "an improved overall MSR."  (AR 46988.)  The SSEB specifically noted, however, that Aery's August 2024 MSR "fell below 95 [percent] . . . specifically for CAS Type II aircraft."  (AR 46977.)  The SSEB went on to note that "since May 2024 to present [Aery] has achieved an average monthly MSR of 95 [percent] for scheduled missions for its CAS Type II aircraft."[9]  (AR 46977-78.)  This language in the SSEB report

---

[9] The SSEB report was prepared in February 2025, and its reference to "present" reflects the Navy's awareness and consideration of the information Aery asserts was not considered.

mirrors the information Aery had provided to the Navy in its Adverse PPQ and CPAR Response on December 18, 2024.  (AR 48286.)

Although the Navy considered and gave weight to Aery's adverse 2023 CPAR, it also evaluated Aery's more recent performance.  The Navy did not overlook relevant and more recent information.  Its conclusion as to the relative weight to assign to Aery's performance over time on the predecessor contract comports with the solicitation and is well within the Navy's discretion.  *See Glenn Defense Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 911 (Fed. Cir. 2013) (citing *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996)).

## VII.   CONCLUSION

The Navy's evaluations of the technical aspects of Aery's proposal and of Aery's past performance are not arbitrary and capricious but are supported by the administrative record.  The Navy also did not treat Aery disparately from Phoenix.

The defendant's motion for judgment on the administrative record is granted, and the plaintiff's motion for judgment on the administrative record is denied.  In addition, because the existing administrative record permits effective judicial review, the plaintiff's motion to supplement the administrative record is denied.

A separate order will be entered concurrently with this opinion directing the entry of judgment.

s/ Richard A. Hertling

**Richard A. Hertling**
**Judge**